IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

HENRY J. BUNCH                                                      PLAINTIFF

            v.                     Civil No. 06-5220

ROBERT ALLEN RILEY,
Fayetteville Police Department; JEREMY
B. GRAMMAR, Fayetteville Police
Department; CHRISTOPHER D. MOAD,
Fayetteville Police Department;
THOMAS E. REED, Fayetteville Police
Department; DEREK F. KRAUSE, Fayetteville
Police Department; NATHANIEL R. COY,
Fayetteville Police Department; and JANET
E. MACRI, Fayetteville Police Department            DEFENDANTS

## **REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

The plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis*.

The events at issue in this lawsuit occurred on November 14, 2004. Plaintiff maintains his constitutional rights were violated when excessive force was used against him during his arrest.

Defendants filed a summary judgment motion (Doc. 23). To assist plaintiff in responding to the summary judgment motion, a questionnaire was propounded (Doc. 26). Plaintiff was given until August 4th to respond to the questionnaire. Plaintiff sought and was given an extension of time to respond to the questionnaire. Plaintiff was given until August 18th to respond the questionnaire (Doc. 28). Plaintiff filed his response on August 22nd (Doc. 29). The

summary judgment motion is before the undersigned for issuance of this report and recommendation.

## Background

Robert Riley, Chris Moad, Nathaniel Coy, are Thomas Reed are currently officers with the Fayetteville Police Department (FPD) and were officers with the FPD on November 14, 2004. *Defts' Ex.* A at ¶ 1; *Defts' Ex.* B at ¶ 1; *Defts' Ex.* C at ¶ 1; *Defts' Ex.* E at ¶ 1; *Plaintiff's Response* (Doc. 29)(hereinafter *Resp.*) at ¶ 1; *Resp.* at ¶ 10; *Resp.* at ¶ 31; *Resp.* at ¶ 57. Reed responded to a call of shots fired in the area of 2875 West Sixth Street. *Defts' Ex.* C; *Resp.* at ¶ 35. He was advised there were two males chasing another male in the Wal-Mart parking lot. *Id.* He was told one of the males was shooting at the other two. *Id.*

As Reed was approaching the intersection of Sixth and One Mile, he observed three males run across Sixth Street in front of his patrol unit. *Defts' Ex.* C; *Resp.* at ¶ 35. One was a Black male in a blue shirt with two males chasing him. *Defts' Ex.* C. Bunch indicates the two males were chasing him and he is not Black. *Resp.* at ¶ 35.

Reed was waved down by the two males who were in pursuit. *Defts' Ex.* C; *Resp.* at ¶ 36. The two men were later identified as Wal-Mart security. *Id.* Reed pulled into the parking lot of 2941 West Sixth Street. *Id.*

Reed identified himself as a police officer, he had the lights and siren on of his patrol unit, and was dressed in uniform. *Defts' Ex.* C; *Resp.* at ¶ 37. He told Bunch to stop, show his hands, and get to the ground. *Id.* Bunch turned and looked at Reed and continued to flee. *Id.*

AO72A
(Rev. 8/82)

Reed observed Bunch run north around the corner of a house and reach into his waistband with his lefthand and remove a handgun. *Defts' Ex.* C; *Resp.* at ¶ 38.

At this point, Reed was almost parallel to Bunch about thirty feet away from him. *Defts' Ex.* C. According to Reed, Bunch turned towards Reed and pointed the handgun at him extended it from his left shoulder and looking directly at Reed, Bunch discharged one round at Reed. *Id.* Reed took cover behind a tree and radioed that shots had been fired. *Id.*

According to Bunch, he shot the gun in the air "very high" over Reed's head. *Resp.* at ¶ 39. Bunch maintains it was obvious he did not shoot at Reed. *Id.* Bunch also maintains that Reed was standing by his car not a tree. *Id.* at ¶ 40.

Officer Janet Macri was about thirty feet behind Reed and to the west. *Defts' Ex.* C; *Resp.* at ¶ 41. Bunch kept running to the north. *Id.*

Riley had also been dispatched to a shots fired call in the area of Wal-Mart West at 2875 W. Sixth. *Defts' Ex.* B; *Resp.* at ¶ 16. Before Riley arrived at the scene, Reed advised by radio that he had witnessed Bunch run north across Sixth Street into a residential area at the intersection of One Mile and Sixth Street. *Defts' Ex.* B; *Resp.* at ¶ 17. Officer Macri arrived at the scene. *Id.* Reed advised that shots had been fired at him. *Defts' Ex.* B; *Resp.* at ¶ 18.

Macri was with Reed when Bunch motioned towards Reed. *Defts' Ex.* H. Macri heard one shot fired in their direction. *Id.* Macri radioed shots had been fired and then went to the ground because of a lack of cover. *Id.* Macri stood back up and saw Bunch running westbound through the yard of a second residence on One Mile. *Defts' Ex.* H; *Resp.* at ¶ 94. Macri began chasing Bunch. *Id.* Macri stopped when Bunch went around the front of the house. *Id.*

Riley then arrived at the scene just after Officers Grammar and Moad. *Defts' Ex.* B. Riley parked at the intersection of One Mile and Sixth Street. *Defts' Ex.* B; *Resp.* at ¶ 19. After determining that Officers Macri and Reed were not injured, Riley proceeded northbound to set up a perimeter. *Id.*

Officer Grammar caught sight of Bunch crouching near a bush in front of the residence at 1020 S. One Mile Road. *Defts' Ex.* B; *Defts' Ex.* D; *Resp.* at ¶ 20. Grammar could see it was a human body behind the bush. *Defts' Ex.* D.

Grammar ordered Bunch to show his hands. *Defts' Ex.* D; *Resp.* at ¶ 50. Bunch stood up and then squatted back down quickly. *Id.* Grammar again ordered Bunch to show his hands and step away from the side of the house. *Id.*

Bunch then stood up, showed Grammar both his hands, and took one step towards the north with his hands out at his sides. *Defts' Ex.* D; *Resp.* at ¶ 51. Grammar ordered Bunch to a prone position in the front yard of 1020 One Mile. *Defts' Ex.* D; *Resp.* at ¶ 52. With his gun pointed at Bunch, Grammar approached and covered Bunch while other officers put him in handcuffs. *Defts' Ex.* D; *Resp.* at ¶ 53.

After Bunch went to the ground, Moad approached and secured Bunch's hands in handcuffs. *Defts' Ex.* E. According to Moad, Bunch attempted to pull his arms away from Moad as he was attempted to handcuff Bunch. *Id.* Riley and Krause assisted in securing Bunch so Moad could handcuff him. *Id.*

As Grammar approached, he saw a black revolver with a wooden handle lying on the ground between Bunch's feet. *Defts' Ex.* D; *Resp.* at ¶ 54. Macri took control of the weapon.

AO72A
(Rev. 8/82)

*Id.* According to Grammar, as Bunch was being searched, he became combative and Grammar saw him kick Riley in the back with one of his feet. *Defts' Ex.* D.

Riley tried to secure one of Bunch's legs to keep him from kicking at people while he was being secured. *Defts' Ex.* B. While searching Bunch, Riley located seven boxes of pseudoephedrine at the bottom of one pant leg that were secured to Bunch's ankle by stereo wire. *Id.* At this point, Bunch kicked Riley in the back and upper neck area. *Id.*

Bunch began to kick and pull away despite commands by Grammar to lay still. *Defts' Ex.* E. Moad gave Bunch several commands to stop resisting. *Id.* Bunch continued to resist and yell at officers. *Id.* Moad ordered Bunch to remain silent. *Id.*

He continued to speak. *Defts' Ex.* E. At one point, Bunch stated "I did not shoot anyone, I only shot in the air." *Id.* Moad again advised Bunch to remain silent, but he continued to speak. *Id.* Bunch states he told the officer he was a confidential informant and that he had shot the weapon into the air. *Resp.* at ¶ 70 & ¶ 71.

Officer Krause applied a drive stun with his taser to Bunch's carotid artery area to get him to stop resisting. *Defts' Ex.* B; *Defts' Ex.* D; *Defts' Ex.* F at ¶ 5. It was a five-second drive stun applied with a X26 Taser to Bunch's carotid artery to subdue him because he was resisting and had kicked Riley. *Defts' Ex.* F at ¶ 5. According to Krause, he applied only one stun drive. *Id.* Krause asserts that at no time while he was present did Bunch say he was injured. *Id.* at ¶ 7.

Bunch, however, contends Krause used the taser at least two or three separate times. *Resp.* at ¶ 81. Bunch also maintains Krause heard him screaming for his life. *Id.* at ¶ 83.

After Bunch was secured and taken to the patrol unit, Moad found a couple of bullet rounds that came out of Bunch's pockets. *Defts' Ex.* B; *Resp.* at ¶ 28. Riley secured a 9mm round, a 38 caliber bullet, the pseudoephedrine, some articles of clothing, and two black address books. *Defts' Ex.* B; *Resp.* at ¶ 29. The pseudoephedrine, address book, a shirt, jacket and a baseball cap which was the property of Wal-Mart, were tagged and submitted into evidence. *Defts' Ex.* B; *Resp.* at ¶ 30.

Reed asserts he had no physical contact with Bunch on November 14th. *Defts' Ex.* C at ¶ 3. Reed did not witness Bunch's apprehension or arrest. *Id.* at ¶ 4.

Coy asserts he did not witness Bunch's apprehension or arrest on November 14th. *Id.* at ¶ 2. When Coy arrived on the scene on November 14th, he states Bunch had already been taken into custody. *Id.* at ¶ 3. Coy did not witness anyone pick Bunch off the ground and slam him to the ground or kick him, beat him with a stick, or stomp on him. *Id.* at ¶ 4. Coy did not witness anyone use excessive physical force on Bunch. *Id.* at ¶ 5. At no time while Coy was present did Bunch claim that he was injured. *Id.* at ¶ 6.

According to Bunch, when he realized Grammar had seen him, he put his weapon down and laid face down with his arms spread out. *Resp.* at ¶ 21. When Moad attempted to handcuff him, Bunch states he fully cooperated. *Id.* at ¶ 22. When Riley attempted to secure Bunch's legs, Bunch states he was handcuffed and it was not until the officer started "electocuting" him that he started jumping around and pulling from them. *Id.* at ¶ 24. Bunch maintains Riley took part in brutalizing him. *Id.* at ¶ 15. Bunch maintains he was handcuffed when Riley, Grammar, Moad, and Krause tasered him and slammed him to the ground kicking him and hitting him with

sticks. *Id.* at ¶ 13. Bunch indicates he was screaming in agnoy and was in fear for his life. *Id.* at ¶ 14.

With respect to Coy, Bunch states he is not absolutely sure what he witnessed but Coy is the one who took him into custody and he knows Bunch was beaten. *Resp.* at ¶ 3. Bunch also maintains he told Coy that he thought the other officers were going to kill him. *Id.* Futher, Bunch maintains Coy arrived at the scene when Bunch was being brutalized. *Id.* at ¶ 2. Finally, Bunch maintains his eyes were swollen and he couldn't even walk as a result of the beating and he had to be carried as a result. *Id.* at ¶ 6.

With respect to Reed, Bunch concedes he had no physical contact with Bunch. *Resp.* at ¶ 32. Bunch indicates he cannot be 100% sure what Reed witnessed. *Defts' Ex.* C at ¶ 4; *Resp.* at ¶ 33.

Bunch concedes Macri did not pick him up off the ground, slam him to the ground, kick him, beat him with a stick, or stomp on him. *Resp.* at ¶ 80. However, he maintains she witnessed it all. *Id.* at ¶ 90.

Bunch was arrested on November 14, 2004, and charged with possession of a controlled substance (marijuana), possession of a controlled substance (pseudoephedrine), possession of drug paraphernalia, and furnishing prohibited articles. *Defts' Ex.* A; *Resp.* at ¶ 7. Bunch was placed in the back of Coy's patrol unit and transported to the city jail. *Defts' Ex.* A; *Resp.* at ¶ 8.

AO72A
(Rev. 8/82)

At city jail, a search of Bunch's clothing was conducted. *Defts' Ex.* A; *Resp.* at ¶ 9. Five grams of a green leafy substance, later determined to be marijuana, was found in a plastic baggie in Bunch's pants pocket. *Defts' Ex.* A; *Resp.* at ¶ 10.

John Brooks is currently an officer with the FPD and was a criminal investigator with the FPD on November 14, 2004. *Defts' Ex.* G at ¶ 1; *Resp.* at ¶ 85. On November 14, 2004, Brooks came to the city jail to recover a gunshot residue kit from Bunch's hands and to photograph numerous tattoos on his upper torso, neck, back, arms, leg, and hands. *Defts' Ex.* G at ¶ 2; *Resp.* at ¶ 86. According to Brooks, Bunch did not tell Brooks he was injured on November 14, 2004. *Defts' Ex.* G at ¶ 3. Bunch, however, states he told Brooks he thought they were going to "kill" him and that Brooks knew Bunch was in shock. *Id.*

As a result of the use of force against him, Bunch maintains his eyes were black and swollen shut. *Resp.* at ¶ 97. He also states he had one tooth kicked out in the front and one on the side broken off at the gum line. *Id.* He states his shoulder was also dislocated and he had bruises all over his legs, back, and arms. *Id.* He states his wrists were cut from the handcuffs and he was in shock for several weeks. *Id.* Bunch indicates he complained to the judge at his arraignment and to the medical department at the Washington County Detention Center. *Id.* He indicates he was taken to a dentist on an emergency run to have his broken teeth removed. *Id.* Bunch states he informed his attorney of the torture he endured. *Id.*

### **Summary Judgment Standard**

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio*

AO72A
(Rev. 8/82)

*Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a . . . verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## **Discussion**

Defendants have now moved for summary judgment. First, they contend they did not violate a constitutional right of the plaintiff. In this regard, they contend there is no evidence that excessive force was used against Bunch. Alternatively, they contend they are entitled to qualified immunity.

"Qualified immunity is a defense available to government officials who can prove that their conduct did 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Carroll v. Pfeffer*, 262 F.3d 847, 849 (8th Cir. 2001)(*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396

AO72A
(Rev. 8/82)

(1982)). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 112 S. Ct. 534, 537, 116 L. Ed. 2d 589 (1991)(*quoting, Malley v. Briggs*, 475 U.S. 335, 343, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)). The inquiry is normally one of pure law. *J.H.H. v. O'Hara*, 878 F.2d 240 (8th Cir. 1989).

"The determination of whether a state actor is entitled to the protection of qualified immunity is a two-step process." *Washington v. Normandy Fire Protection Dist.*, 272 F.3d 522, 526 (8th Cir. 2001). The first step is to determine whether, viewing the facts in the light most favorable to the plaintiff, the officers' conduct violated a constitutional right." *Samuelson v. City of New Ulm*, 455 F.3d 871, 875 (8th Cir. 2006). *See also Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). Second, "[i]f a constitutional right has been violated, we must then determine if such right was clearly established." *Samuelson*, 455 F.3d at 875 (citation omitted). "This second step is a fact-intensive inquiry and must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (internal quotation marks and citations omitted).

Bunch contends defendants violated his constitutional right to be free from excessive force during the course of his arrest. "All claims that law enforcement officers have used excessive force in the course of an arrest or investigatory stop of a free citizen should be analyzed under the reasonableness standard of the Fourth Amendment." *Winters v. Adams*, 254 F.3d 758, 764 (8th Cir. 2001)(citation omitted). *See also, Henderson v. Munn*, 439 F.3d 497, 502 (8th Cir. 2006).

AO72A
(Rev. 8/82)

"Police officers are liable for the use of excessive force when they use force that is not objectively reasonable in light of the facts and circumstances confronting them." *Goff v. Bise*, 173 F.3d 1068, 1073 (8th Cir. 1999)(citations omitted). In *Lawson v. Hulm*, 223 F.3d 831 (8th Cir. 2000), the court stated:

> Although there can be no question that the Fourth Amendment prohibits unreasonable seizures of the person, it is also well established that "not every push or shove violates the Fourth Amendment. The applicable test is "whether the force used to effect a particular seizure is reasonable." In the context of a claim of excessive force, the "reasonableness" inquiry must be an objective one in that the court must only evaluate "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."
>
> The "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation."

*Lawson*, 223 F.3d at 834 (citations omitted).

The use of some force by police is reasonable when an arrestee flees, resists arrest, or disobeys orders. *See e.g., Foster v. Metropolitan Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir. 1990). The lack of injury or a minor degree of injury is also relevant in determining whether the force used was excessive. *Id.* Additionally, the court may consider whether any injury suffered is explained by the arrestee's own actions. *See e.g., Greiner v. City of Champlin*, 27 F.3d 1346, 1355 (8th Cir. 1994).

With respect to the use of a taser gun, it has been noted that:

Although being struck by a taser gun is an unpleasant experience, the amount of force Reynolds used-a single use of the taser gun causing a one-time shocking-was reasonably proportionate to the need for force and did not inflict any serious

-11-

> injury. Indeed, the police video shows that Draper was standing up, handcuffed, and coherent shortly after the taser gun stunned and calmed him. The single use of the taser gun may well have prevented a physical struggle and serious harm to either Draper or Reynolds.

*Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004). *See also Hinton v. City of Elmwood, Kansas*, 997 F.2d 774, 781 (10th Cir. 1993)(not excessive force when use of stun gun ceased once individual who was resisting arrest was successfully handcuffed).

In this case, the summary judgment record consists of the affidavits of the defendants, the defendants' case reports or arrest reports, and plaintiff's summary judgment response that is sworn to under penalty of perjury. The parties provide contradictory versions of what occurred after Bunch was apprehended and handcuffed. Defendants maintain Bunch was agitated, repeatedly refused to comply with their orders, struggled, kicked one officer, and actively and openly resisted being searched.

In contrast, Bunch states he was already on the ground restrained by handcuffs when excessive force was used against him. While he admits he did keep talking despite defendants' orders to remain silent, he states he fully cooperated and did not struggle in anyway until after he was tasered. *Resp.* at ¶ 22; ¶ 24; ¶ 55. Bunch maintains he never resisted. *Id.* at ¶ 56. Once he had been tasered, Bunch states he did start jumping around and pulling from the officers because he was being "tortured." *Id.* at ¶ 24; ¶ 65.

At the summary judgment stage, we must view the evidence in the light most favorable to the nonmoving party. *See e.g., Henderson,* 439 F. 3d at 503. Based on the record before us, we believe a genuine issue of material fact exists concerning whether the amount of force used after Bunch was restrained was excessive. *See e.g., King v. Shoar*, No. 3:06-cv-61, 2007 WL

2066171 (M.D. Fla. July 13, 2007)("While the use of a taser is not per se excessive force, . . . it may be unnecessary, and therefore unreasonable, for an officer to use force if a suspect is already secured. On consideration of the evidence presented, the Court finds that there is an issue of fact as to whether King was already handcuffed before the taser was applied"). *Cf. Henderson v. Munn*, 439 F.3d 497, 502-03 (8th Cir. 2006)(upholding the denial of summary judgment based on an arrestee's evidence regarding the use of pepper spray while he was under control).

As noted above, the second inquiry is whether the right is clearly established. Defendants maintain even if threshold question is resolved, for purposes of this motion in Bunch's favor, they are nevertheless entitled to summary judgment because they were not on notice that their conduct would be clearly unlawful.

"In other words, if the officers' mistake as to what conduct the law required is reasonable, they are entitled to the immunity defense. *Kuha v. City of Minnetonka*, 365 F.3d 590, 602 (8th Cir. 2003)(citation omitted). "Defendants will not be immune, however, if on an objective basis, it is obvious that no reasonably competent officer would have concluded that the defendant should have taken the disputed action." *Id.*

"[T]he right to be from excessive force in the context of an arrest is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures." *Henderson*, 439 F.3d at 503. In this case, Bunch maintains the taser or stun gun was deployed multiple times after he quit resisting and was handcuffed. Even under defendants' version of the events of that day, the stun gun was deployed at least one time after Bunch was handcuffed. *See e.g., Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir. 1993)(Eighth Amendment case--noting testimony revealed

-13-

a stun gun inflicts a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless). There were multiple officers present, Bunch's weapon had been secured, there was no indication Bunch was still armed or circumstances were volatile or deadly. We find defendants not entitled to qualified immunity. We believe the state of the law gave the officers fair warning that the deployment of a stun gun on an unarmed arrestee after he was handcuffed was unconstitutional. *See e.g., Roberts v. Manigold,* No. 06-2039, 2007 WL 1732903 (6th Cir. June 14, 2007)("Roberts claims Stricklen needlessly used an electroshock weapon on him. Though the events Roberts described took place over a very short period of time, a reasonable jury could find that Stricklen used unnecessary (and thus excessive) force in violation of Roberts's clearly established Four Amendment right").

We do believe Nathaniel Coy and Thomas Reed are entitled to summary judgment in their favor. Bunch does not indicate that either were involved in the alleged use of force against him. Nor does Bunch maintain either were in a position to intervene on his behalf when the force was allegedly being used against him. In fact, Bunch states he is not sure what either Coy or Reed witnessed. We therefore do not believe there is any basis on which these individuals can be held liable. *See Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985)(§ 1983 liability requires personal involvement in or direct responsibility for actions resulting in violation).

## Conclusion

For the reasons stated, I recommend that the defendants' motion for summary judgment (Doc. 23) be granted in part and denied in part. Specifically, I recommend that the motion be granted with respect to all claims against Nathaniel R. Coy and Thomas E. Reed. In all other respects, I recommend that the motion be denied.

-14-

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this ___ day of August 2008.

/s/ *J. Marschewski*
 HON. JAMES R. MARSCHEWSKI
 UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)