IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

HENRY J. BUNCH                                                     PLAINTIFF

                v.                  Civil No. 06-5220

ROBERT ALLEN RILEY,
Fayetteville Police Department; JEREMY
B. GRAMMAR, Fayetteville Police
Department; CHRISTOPHER D. MOAD,
Fayetteville Police Department;
DEREK F. KRAUSE, Fayetteville
Police Department; and JANET
E. MACRI, Fayetteville Police Department                DEFENDANTS

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action brought by Henry J. Bunch under the provisions of 42 U.S.C. § 1983. Bunch filed this action *pro se* and *in forma pauperis*. Bunch contends excessive force was used against him by the defendants during his arrest on November 14, 2004.

As a jury demand was made in this case, an evidentiary hearing was scheduled to determine whether material issues of fact triable to a jury exist in this case. The evidentiary hearing was held on February 26, 2009. Following the presentation of evidence, the issues were taken under advisement pending preparation of this report and recommendation.

### I. BACKGROUND & EVIDENCE PRESENTED

At the evidentiary hearing, the court heard testimony from the following witnesses: (1) Derek Krause (via telephone); (2) Christopher Moad; (3) Chris Lockhart; (4) Quanah Bunch; (5)

-1-

AO72A
(Rev. 8/82)

Charles Whited; (6) Charles Bryan; (7) Jeremy Grammer; (8) Robert Riley; (9) Janet Macri; and (10) Henry Bunch.

For purposes of discussion, we will summarize in the first person the hearing testimony of the various witnesses. The summary of the testimony will not necessarily be presented in the order the witnesses testified at the hearing.

### *Derek Krause*

I'm currently in the United States Marine Corps. On November 14, 2004, I was an officer for the Fayetteville Police Department. I was not informed that Bunch was working undercover. I was never made aware of the fact that Bunch was working undercover.

I heard a shot fired. I don't recall you saying that you had shot the gun in the air.

I never made any statement referring to Bunch as a "wet back." Bunch was not completely secured when I approached. He was lying face down and Grammer had him at gun point. Moad was trying to effect the arrest. Bunch had his arm under his body. Riley was trying to search him. Bunch kicked Riley. I used a reasonable amount of force to assist with bringing him under control and securing him. I applied a five second drive stun to the carotid artery area of the neck. I removed the cartridge from the stun gun because of the close range. I never hit Bunch with the stun gun itself. I was aware of the fact that Bunch had a free arm.

At the time, Riley, Grammer, Moad, myself, Reed, and Macri were all there. Bunch had one hand cuffed. Bunch would not free his other arm so Moad could secure him and complete the arrest. Part of the reason you use a taser is to complete an arrest. The amount of force was reasonable to complete the search. We didn't know if he had other weapons.

AO72A
(Rev. 8/82)

When you use the taser in close proximity you don't use the probes that shoot out. The probes would puncture the skin. The five second time is preset. The probes are like fish hooks. We are not allowed to remove the probes.

The taser has two receptacles on the end that conduct electricity that can be used if you are in close proximity to the individual. You must take the cartridge off. If the probes are used, the fire department has to be called to take the probes off. The taser runs five seconds and then shuts off. If you needed to, you could do another charge. You have to flip the switch on, remove the cartridge, apply the device and then pull the trigger. It cuts off automatically after five seconds. I don't know if you continued to hold the trigger down if it would apply another five second charge.

I had no trouble accessing the carotid artery area on Bunch's neck. I was able to get a clean area. He was moving around some.

I didn't hear any complaints from him. I didn't have any further contact with him after he was taken away. I have no seen any photographs of him after his arrest.

After the drive stun, Moad was able to effectively grab Bunch's arm and complete the arrest. I didn't witness any kicking of Bunch or any use of unreasonable force. I don't recall Bunch being body slammed. Bunch was kicking other officers. We had to completely search and arrest Bunch.

I went back to the police department after Bunch's arrest. I did not go down to the jail.

### *Chris Moad*

On November 14, 2004, I was on duty for the Fayetteville Police Department when I was called to assist in Bunch's arrest. I didn't know he was working for the Federal Marshal. I had

-3-

AO72A
(Rev. 8/82)

never seen this document entitled confidential source agreement between Bunch and the Cherokee Nation Marshal Service. *Court's Exhibit* 1 at page 9.

When you are responding to a call that shots have been fired, there is an additional concern for safety. I didn't see Bunch fire any shots. When I arrived Bunch was laying on the ground. There was a firearm at his feet.

He was in a residential yard. The house was in the shape of an "L." He was within eight feet of the front door. I don't recall if he was on grass.

I recall Grammer pointing a shotgun at Bunch. Grammer and Riley were there and shortly thereafter Macri came up. I believe Macri secured the firearm.

I came up to Bunch and placed a handcuff on him. As I was attempting to secure a handcuff on the other wrist, Bunch resisted. Riley was at Bunch's feet facing away from the feet. Riley got kicked. Bunch was not properly secured. Krause applied a drive stun. I believe the stun was applied to the right side. Bunch continued to resist even after the drive stun was applied. He resisted while we were searching him. A quick search was done. Some other items may have been confiscated at the jail.

I didn't see anyone kick him, pick him up off the ground and slam him down, or hit him with sticks. He was tasered while not handcuffed. I didn't hear anything about Bunch being a confidential informant.

I didn't see Krause strike Bunch with the stun gun. Krause didn't appear to stun Bunch more than one time.

I would go into a store as a confidential informant carrying a gun. To preserve life I would steal. I wouldn't fire a gun.

-4-

The third shot was fired in a residential area. Even a warning shot could have hit someone. He didn't make any comments about being a confidential informant.

I didn't know Bunch's teeth were kicked out. I didn't know he was part of a covert operation. I know Bunch was not authorized to fire rounds off. I would shop lift pills to save someone's life.

I have not seen the pictures contained in *Defendants' Exhibit* 9. I can't explain how Bunch got the scratches and abrasions on his face. However, he was wrestling around on the ground. I didn't go to the jail. Bunch didn't make any complaints of injury after he was secured. If injured, an arrestee is taken for care before they are booked. I believe Bunch was transported by Officer Nat Coy.

### *Chris Lockhart*

I'm a bail bondsman. In November of 2004 Bunch contacted me from the Washington County Jail. Bunch asked me to contact Marshal Scott Craig. Bunch said he had been working as his confidential informant. Bunch wanted me to make Craig aware of his arrest by the Fayetteville Police Department.

When I met Bunch for the first time, I can't recall if he had any physical injuries. I do believe he showed me some scars on his wrists from the handcuffs. I don't recall what day I had the first conversation with Bunch. It was not very long after his arrest. He complained that he had been beaten by the police. He was adamant about the fact that he had been beaten. I pulled up his booking picture.

AO72A
(Rev. 8/82)

Craig was trying to help Bunch make bond. I never bonded Bunch out. I can't recall the amount of the bond on Bunch but I know it was extremely high. Craig never came over here to meet with me.

### *Quanah May Bunch*

Bunch is my uncle. After Bunch was arrested I went to the County jail to see him. The first time I went, I didn't get in to see him. I got into see him the second day and then went every weekend. I believe it was the third day after he was arrested that I got to see him.

I saw his injuries on television. They showed a picture of him. He had black eyes, his face was bruised and swollen, and they knocked out his tooth. His wrists were also swollen from the handcuffs being put on too tight.

He didn't look like the photograph contained in *Defendants' Exhibit* 9 at page 12 when I saw him. He looked more like the booking photos in *Court's Exhibit* 3 with his face all swollen up, his eye black, and abrasions on his face. I saw it on the news.

No one ever explained why there was a day delay between his arrest and the booking into the Washington County Jail. His front tooth was missing. I think it might have been his right front tooth.

I saw it on the television I believe on the 15th. I went to see him at the jail on the 16th and I couldn't see him. I went back on the 17th and was able to see him.

Before that I saw him on the morning of the 14th. We lived together. He had been living with me for six or seven months. I hadn't seen any damage to his teeth before. I don't recall him complaining about toothaches.

When I saw him, he was standing behind a window. His lip was cracked. In the booking picture, I don't see any damage to his lip. But in the picture on the Channel 5 or 6 news I saw damage to his lip. He had a white shirt on Channel 5 and I think Channel 6. His lip was busted on it.

On the first visit to the jail, I was there with Rhonda. She is my mother. No Rhonda wasn't with me the first day, she went with me the second day.

### *Charles Whited*

I'm currently an inmate in the Arkansas Department of Correction (ADC). On November 16, 2004, I was incarcerated in the Washington County Detention Center (WCDC).

I met Bunch at arraignment. He had two black eyes, his face was swollen and cut-up, and something was wrong with his teeth. I don't remember if there was something wrong with one or more than one of his teeth. I just don't recall. I thought he had been in a car wreck. I was concerned about his health.

He looked worse than the pictures contained in Defendants' Exhibit 9 when I saw him. One eye was almost completely swollen shut. He looked worse than the booking photo contained in Court's Exhibit 3. He was more swollen. His left eye was completely swollen shut. He didn't mention being a confidential informant to me.

### *Charles Bryan*

I'm currently an inmate in the ADC. I was Bunch's cell-mate at the WCDC.

I remember some of his injuries. When I got there his eyes were swollen and black. He looked like Rocky the Racoon. I can't recall a missing tooth. He possibly had problems with his teeth.

AO72A
(Rev. 8/82)

I do remember Bunch sleeping on the floor. He was having a hard time getting around. He may have asked for help. He seemed a little out of it when he first got there–a little disoriented.

We were cell-mates for probably thirty days at the most. I was in a haze myself. I was charged with a felony and looking at going to prison. He didn't say anything about being a confidential informant.

I think the only other time I saw him while I was at the WCDC was at visitation one time.

We are currently both at the same prison. I see him every now and then. I have been convicted of felony offenses including forgery and communicating a false alarm.

### *Jeremy Grammer*

On November 14, 2004, I assisted in Bunch's arrest. I didn't know he was working for the Federal Marshal's Office.

You have a heightened awareness when you know shots have been fired at an officer. There is more concern for safety.

I heard Reed say the suspect had fired on him. I responded to 1020 One Mile. This is directly across the street and behind what was an old E-Z Mart on Sixth Street in Fayetteville, Arkansas.

When I arrived at the scene, I was the first one to spot Bunch behind a bush. This was a residential area. There was a small house shaped like an "L." The yard was grass with a sidewalk leading to the front door. It was a normal lawn for a small residence. An elderly couple was living there. I spoke with them.

AO72A
(Rev. 8/82)

There was a gentleman who came out of a house across the street. I was aware of him but I never talked to him.

I was assessing the scene when I observed what I thought was somebody crouched behind a bush. Bunch popped up and then crunched back down. I continued to give orders. I ordered Bunch into a prone position. I told him to keep his hands away from his body and lie down.

Bunch then stepped out to the north and laid down in a prone position. I had a shotgun pointed at Bunch. *Plaintiff's Exhibit* C. Riley, Moad, and Macri arrived almost simultaneously. I was the cover officer. Riley went to Bunch's leg area and feet. Riley started searching the feet and leg area. I saw Riley remove something from Bunch's pants. At this time, Bunch was actively resisting.

He was not handcuffed at this point. Moad was attempting to get him handcuffed. She had gotten one cuff on but he was refusing to give her his second hand to be cuffed.

I saw Bunch kick Riley in the back. When I saw Riley get kicked, Moad and I both told Krause to tase Bunch. Krause applied a five second stun drive. Moad was then able to complete handcuffing Bunch. After he was tased, we got the cuffs on his right away.

Macri arrived and immediately took possession of Bunch's weapon. As far as I know, she didn't do anything else.

I did not hit Bunch. I did not kick him. No one had a stick.

I was standing next to Krause when he applied the stun gun. I didn't see him hit Bunch with it.

I don't recall what Bunch said. That was five or six years ago.

-9-

No one picked Bunch up and body slammed him. I had no idea who Bunch was shooting at.

In my court testimony at Bunch's criminal trial I believe I said he was resisting arrest. Bunch was charged with battery on an officer because he kicked Riley. Bunch was not handcuffed when he kicked Riley.

I went to the police department following Bunch's arrest. I assume I was at the department some time while Bunch was at the city jail.

Bunch was first transported to the city jail. Detective Chandler interviewed him and then decided on the charges. Bunch was booked into the city jail. The city jail doesn't hold felony offenders. So Bunch was booked in and printed and then transferred to the WCDC.

It was dusk, in the evening, when Bunch was arrested. He was held at the city jail first while they conducted an investigation.

If an individual is injured during an arrest, they are to be seen by an emergency room physician. I didn't see Bunch after our contact. The only injury I recall seeing on him was a scrape over his left eye. I don't know how he received it.

The pictures contained in Defendants' Exhibit 10 are the way he appeared when he left the scene. I don't believe any officer involved had to have treatment. Riley got kicked. I don't know if he needed treatment.

I'm incarcerated because I was convicted of possession of pornography.

*Robert Riley*

On November 14, 2004, I was on duty for the Fayetteville Police Department. I assisted in Bunch's arrest.

I didn't know he was working as a confidential informant for the Federal Marshal's Office. I know nothing of his working undercover.

It doesn't make me hyper to respond to a shots fired call. It makes me alert.

As we were approaching Bunch, I was north of Grammer. Moad had handcuffs out. I was focusing on legs. Macri went for the gun. There were a couple of live rounds lying around but I believe the weapon was a 38.

Moad was dealing with the upper portion of the body. I had his ankles in a head lock type of gesture. One leg came loose. He kicked me a couple of feet. I had a nice boot print. He had on two pairs of pants. Merchandise was coming out including pills (pseudoephedrine). He could have had a weapon, needles, a knife. I secured bullets. He was never cooperating. I jumped back up on his legs.

As far as I knew he wasn't handcuffed when tased. I was at Bunch's feet and my back was towards his head. I heard the taser go off. I didn't see it. I was dealing with wild legs.

After I heard the taser go off, I got control of his feet and he calmed down quite a bit. He was never fully compliant.

I know Bunch laid on the ground. I remember him saying something about having shot in the air. I don't recall anyone saying anything like "wet back."

Bunch did not get picked up five foot off the ground and slammed down. No one kicked Bunch. I'm the one who got kicked. I saw no kicking, punching, or hitting with sticks. Bunch made no complaints of pain or injury. No force was used that could cause two black eyes.

After Bunch got transported, I had nothing to do with him. I had nothing to do with the charges that were brought against him. That is up to the prosecutor. I'm a patrol officer. I have

AO72A
(Rev. 8/82)

nothing to do with the jail. I did take the evidence back to the police department. But I didn't enter the jail. I didn't see Bunch again until the trial.

I do recall seeing a gentleman come out of his house across the street. I believe I told him to go back in the house.

I testified in Bunch's criminal trial.

### *Janet Macri*

On November 14, 2004, I was on duty with the Fayetteville Police Department. I assisted in Bunch's arrest. I no longer work for the police department.

I didn't know Bunch was working for the Federal Marshal's Office. It makes you more alert when you hear that shots have been fired at an officer.

I was dispatched in response to a shots fired call. *Plaintiff's Exhibit* F. Bunch shot his weapon towards Officer Reed. The gun was not up in the air at all. I was approaching Officer Reed at the time.

I was not present when Bunch was handcuffed or tapered. I came up and grabbed the weapon located between Bunch's legs and immediately left to secure the weapon in my truck. I really had no view of Bunch at all. The officers were all struggling with Bunch.

Bunch was not bleeding in the face. I didn't see any injuries on Bunch that I recall.

I didn't empty the gun. I turned it over to Detective Chandler. I don't know if there were live rounds left in it.

I was not at the jail that night. I went and wrote my report and got sent home because I had been shot at. I never saw a gentleman across the street.

AO72A
(Rev. 8/82)

The policy is that if someone is injured during arrest that they are to be taken to the hospital prior to booking.

### *Henry Bunch*

My confidential source agreement says I'm not an employee of the Cherokee Nation Marshal Service. *Court's Exhibit* 1. It also provides that I will not engage in any unlawful acts for which I may be prosecuted except as specifically authorized by representatives of the Cherokee Nation Marshal Service. *Id.*

I did methamphetamine that morning at about noon in Springdale. I was aware of what was happening. I was under the influence.

I was trying to set up a methamphetamine dealer. I was supposed to be supplying ingredients. I left messages for Scott Craig, my contact, at the Cherokee Nation Federal Marshal's Office. The Cherokee Nation's records don't show any calls to the number I listed at being Craig's.

I was still high when I went into Wal-Mart. I knew I wasn't going to pull the gun on anyone.

I didn't want to buy the pills at Wal-Mart because the gentleman was afraid the purchase would be flagged. I was trying to get a hold of Craig. I couldn't get him. The other guy was in sporting goods. I took the camouflage deal. I had money on me and could have paid. I had a knife and the camouflage deal and put it up my sleeve. I saw someone watching me. I took the stuff out of my sleeve. A gentleman asked me to stop. I didn't. I took off.

AO72A
(Rev. 8/82)

Two of the security guards tackled me. I hit the asphalt. Their weight was on top of me. The revolver was in my waist band. It was pressing into me. They were pulling my arms behind me.

We were wrestling probably twenty seconds. I could have shot them easily. I jerked the gun upward. It crossed my mind that if they got the gun they could have shot me. I shot once. Then I shot again.

It was about 5:00 p.m. It wasn't real busy where we were. I wasn't paying attention. I shot towards the store.

Then I took off running. The officers beat me because I fired a weapon. I laid down and I was trying to explain that I had only shot in the air. They tased me. I started jumping around because I was being electrocuted.

I saw a gentleman standing by a tree. I knew in my mind that they were abusing their authority. I started screaming. I felt fortunate they didn't hurt me more than they did. I made mistakes but the shots were in the air.

Craig didn't authorize me to take the gun into the store or to shoot the gun any where. I didn't tell the security officers I was a confidential informant. I just shot two shots and took off running.

I saw Macri and Reed pursuing me. I didn't say I was a confidential informant. I took a shot and kept running.

After that point, I completely cooperated. Riley, Moad, Krause, Grammer, picked me up, threw me down, tased me, beat me with sticks. Macri didn't do any of that. I was kicked in the jaw. My left front tooth was broken off and one was cracked on the side. The left front tooth

-14-

was filled and the one on the side was pulled. As a result, both my eyes were black and swollen, my shoulder was dislocated, one tooth was broken. The pictures in Defendants Exhibit 9 were taken the first night. My eyes were not swollen shut yet. They hadn't started discoloring yet. I felt fortunate to be alive.

Court's Exhibit 2 is my initial statement to Detective Chandler. Court's Exhibit 3 are documents from the WCDC. I mention a cracked tooth. I don't mention black eyes or a dislocated shoulder. I don't mention officers picking me up or hitting me etc.

I was a little apprehensive about filling out papers at the detention center mentioning what the officers had done. I thought Officer Craig was coming to help me out. I was trying not to make a big deal out of it. I was waiting for him to come and assist me and trying to ride it out.

My shoulder is still dislocated. I told my attorney what happened. I told the judge what happened. I recall seeing Quanah three or four days after the incident.

## II. DISCUSSION

A pre-trial evidentiary hearing may be utilized to determine whether a pro se inmate's section 1983 claims warrant a jury trial, as long as the hearing is conducted in a manner consistent with the inmate's right to a jury trial. *See Hobbs v. Lockhart,* 46 F.3d 864, 868 (8th Cir. 1995); *Johnson v. Bi-State Justice Ctr.,* 12 F.3d 133, 135 (8th Cir. 1993). The standard to be applied in such a proceeding is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Johnson,* 12 F.3d at 136 (citation omitted). "Even if both sides present evidence, so that the procedure resembles a summary judgment motion with live evidence, the standard remains the same." *Hobbs*, 46 F.3d at 868. In applying this standard, the court must avoid

-15-

credibility determinations, believe the inmate's evidence, and draw all inferences in the inmate's favor. *Johnson*, 12 F.3d at 136.

"All claims that law enforcement officers have used excessive force in the course of an arrest or investigatory stop of a free citizen should be analyzed under the reasonableness standard of the Fourth Amendment." *Winters v. Adams*, 254 F.3d 758, 764 (8th Cir. 2001)(citation omitted). *See also, Henderson v. Munn*, 439 F.3d 497, 502 (8th Cir. 2006). "Police officers are liable for the use of excessive force when they use force that is not objectively reasonable in light of the facts and circumstances confronting them." *Goff v. Bise*, 173 F.3d 1068, 1073 (8th Cir. 1999)(citations omitted). In *Lawson v. Hulm*, 223 F.3d 831 (8th Cir. 2000), the court stated:

> Although there can be no question that the Fourth Amendment prohibits unreasonable seizures of the person, it is also well established that "not every push or shove violates the Fourth Amendment. The applicable test is "whether the force used to effect a particular seizure is reasonable." In the context of a claim of excessive force, the "reasonableness" inquiry must be an objective one in that the court must only evaluate "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."
>
> The "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation."

*Lawson*, 223 F.3d at 834 (citations omitted).

The use of some force by police is reasonable when an arrestee flees, resists arrest, or disobeys orders. *See e.g., Foster v. Metropolitan Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir. 1990). The lack of injury or a minor degree of injury is also relevant in determining whether

the force used was excessive. *Id.* Additionally, the court may consider whether any injury suffered is explained by the arrestee's own actions. *See e.g., Greiner v. City of Champlin*, 27 F.3d 1346, 1355 (8th Cir. 1994).

For purposes of determining whether there are issues triable to a jury, the following facts are undisputed: Bunch had entered into an agreement to act as a confidential informant for the Cherokee Nation Federal Marshal; Craig did not know Bunch was going to Wal-Mart that day to steal pseudoephedrine; Craig did not know Bunch was carrying a gun and had not authorized him to carry the weapon or discharge the weapon; Bunch was under the influence of methamphetamine at the time of the events in question; immediately prior to his encounter with the defendants he was tackled on an asphalt parking lot by two security guards; he wrestled with the security guards for, in his estimation approximately twenty seconds, during which time he was struggling to retrieve a revolver from his waist band; Bunch discharged the weapon twice while fleeing the area of the store; when he realized he was being pursued on foot by two officers he again discharged his weapon and continued to flee; Bunch hide behind a bush at a residence; he was laying prone on the ground at the residence with one officer on his legs attempting to secure them and another officer attempting to secure his arms; a five second drive stun was applied; once the drive stun was applied Bunch was arrested, cuffed, and taken to the police station; Bunch submitted no requests for treatment due to injuries inflicted by the officers other than mentioning having a cracked tooth from being kicked in the jaw on a request for treatment on November 18th, *Court's Exhibit* 3 at page16, and he did not mention the alleged beating in an interview conducted shortly after his arrest, *Court's Exhibit* 2.

AO72A
(Rev. 8/82)

Although Bunch remained incarcerated in the WCDC until April 1, 2005, he did not submit a single request for treatment for any of the other injuries he alleges he sustained as a result of the defendants' alleged use of excessive force on November 14th. *Court's Exhibit* 3. Moreover, we note several of the requests about Bunch needing dental care concern a back tooth that allegedly had an exposed root rather than a front tooth allegedly broken or a side tooth allegedly cracked during the November 14th arrest. *See Court's Exhibit* 3 (medical request dated November 28, 2004). The remaining medical requests are not related in anyway to injuries Bunch allegedly sustained during the November 14th arrest. *See Court's Exhibit* 3 (November 29, 2004 request--excessive gas; December 6, 2004 request–Athelete's foot; December 12, 2004–dry skin; December 21, 2004–dry skin; December 28, 2004–dry skin; January 3, 2005–nerves; January 4, 2005–sinus drainage; January 15, 2005–hair cut; etc.).

Under the circumstances, we conclude Bunch's claim fails. The mere fact that Bunch ended up with a some scratches, abrasions, and a chipped tooth, does not establish a violation of the Fourteenth Amendment or create a jury issue as to whether the Fourteenth Amendment was violated.

### III. CONCLUSION

Assuming as true all facts supporting Bunch's claim and giving him the benefit of all reasonable inferences, I believe that the evidence is insufficient to support a finding that defendants used excessive force against him. Accordingly, I recommend that Bunch's complaint be dismissed with prejudice.

AO72A
(Rev. 8/82)

**The parties have ten days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 30th day of March 2009.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)